Thomas Edward KAYSER and Ronald Mathes, Appellants,

v.

UNITED STATES of America, Appellee.

No. 18956.

United States Court of Appeals Eighth Circuit.

May 21, 1968.

Robert D. Kingsland, Jefferson City, Mo., for appellants, Thomas P. Howe, Clayton, Mo., on the brief.

Bruce C. Houdek, Asst. U. S. Atty., Kansas City, Mo., for appellee, Calvin K. Hamilton, U. S. Atty., Kansas City, Mo., on the brief.

Before MEHAFFY, GIBSON and HEANEY, Circuit Judges.

MEHAFFY, Circuit Judge.

Thomas Edward Kayser and Ronald Mathes, defendants, were tried to a jury and convicted under a single-count indictment charging that on December 2, 1966 they entered the Farmers Bank of Lohman in Lohman, Missouri, the deposits of which were insured by the Federal Deposit Insurance Corporation, with intent to commit a felony, larceny of money and property, a violation of 18 U.S.C. § 2113(a) and § 2113(f).[1]

For reversal of their convictions, defendants assign as error that: (1) there was insufficient evidence to support the verdict; (2) the district court's rulings on the admissibility of certain evidence were erroneous because the arrest was illegal; and (3) the district court's rul-

---

1. 18 U.S.C. § 2113. Bank robbery and incidental crimes.

"(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, or any savings and loan association; or

"Whoever enters or attempts to enter any bank, or any savings and loan association, or any building used in whole or in part as a bank, or as a savings and loan association, with intent to commit in such bank, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank or such savings and loan association and in violation of any statute of the United States, or any larceny—

"Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both."

18 U.S.C. § 2113(f).

"(f) As used in this section the term 'bank' means any member bank of the Federal Reserve System, * * * and any bank the deposits of which are insured by the Federal Deposit Insurance Corporation."

ings on the admissibility of certain testimony were erroneous and prejudicial.

We affirm the convictions.

### Sufficiency of the Evidence.

Briefly summarized, the undisputed facts are that in the early morning hours of December 2, 1966, the Farmers Bank of Lohman was burglarized, the door to the bank, the vault door, and some of the safety deposit boxes being forced or cut open, and a substantial amount in cash, checks and bonds being stolen. Arnold Linsenbardt, who lived next door to the bank, saw someone in and around the bank at approximately 4:30 a. m. on December 2, 1966. He immediately had his sister notify the police. Linsenbardt also saw an acetylene torch assembly in front of the bank on the sidewalk. The police dispatcher of Jefferson City, Missouri notified the local police officers at 4:55 a. m. that someone had been seen in the bank and that there possibly had been a burglary. He directed Victor I. Phillips, a Jefferson City police officer, to proceed to the intersection of Highways C and 54, about 500 yards outside the city limits of Jefferson City, Missouri, to observe the traffic coming from Lohman, about 12 to 15 miles away, on highway C.

Officer Phillips arrived at this location about 5:00 a. m. and approximately five minutes later observed defendants' car, a 1956 Buick without lights on, coming from Lohman on highway C, turning right onto Ellis Boulevard, and then swerving into the wrong lane as it continued on highway 54. Officer Phillips pulled in behind the Buick, obtained its license number, and radioed the number to his dispatcher for a license ownership check. He then turned on his red light and siren and stopped the Buick inside the city limits. Before he got out of his car, he received an answer from the dispatcher that the license plate belonged to a 1957 Pontiac owned by Billy Mason of St. Louis, Missouri.

There were three men in the car— Kayser and Mathes, the defendants, and Roger Merton Bond. Officer Phillips observed defendant Mathes, who was driving the Buick, lean over to the right front seat of the car and then jump back. Mathes got out and Phillips ordered him to raise his hands. Phillips then directed the other two occupants of the Buick to get out. He observed that the men were dirty, had soot on their clothing, faces and hands and that the Buick had no key in the ignition. There were two .38 caliber revolvers in the glove compartment of the car which were not introduced into evidence. He asked Mathes whose car he was driving and Mathes answered that it had been loaned to him by a fellow named Billy, whose last name he did not know. All three men gave conflicting and evasive answers to questions of where they had been and where they were going. For these reasons, Phillips told the men they were under arrest for suspicion of auto theft and, with the assistance of another policeman, took the men to the Jefferson City jail and impounded the car.

An unauthorized search of the car was made by a Missouri highway patrol sergeant who found bags of coins and other items belonging to the bank. This evidence found in the automobile was ordered suppressed by the court because no search warrant was obtained prior to the search and the search was not incident to the arrest.

Testimony reflected that the acetylene torch found in front of the bank had been rented in St. Louis by two men, one of whom was similar in appearance to one of the defendants. The men were in a Ford automobile, bearing the same license number as the Buick occupied by defendants at the time of their apprehension.

The bank reported a loss of $782.35 in checks and cash and $5900.00 in Series E Bonds, plus the contents of bank cashier Dawson's safety deposit box. Further evidence proved that Mathes had on two pairs of pants at the time of the arrest. Later, one of the pairs of pants, which had burned metal thereon, was found under a mattress in Mathes' cell

by officers. The F.B.I. chemically analyzed the ashes found on the floor of the bank and found they were the ashes of metal of some sort. Carol Bond, wife of Roger Merton Bond, testified that her husband had sent her to the store to buy a pair of brown work gloves similar to the one found on December 2 in the bank. She also testified that Kayser, Mathes and their wives came to her house the night of December 1; that Kayser, Mathes and Bond, her husband, left her house together around 6:30 p. m., and that she heard Mathes tell her husband as they left that "there would be some money in it." Bond was also charged in this indictment but did not appear for the trial.

Defendants Kayser and Mathes did not offer any evidence or take the witness stand at the trial but rested their case after denial of their motion for a directed verdict of acquittal at the conclusion of the Government's case.

■ As a reviewing court, we must consider the issue of sufficiency of the evidence in the light most favorable to the verdict. Cave v. United States, 390 F.2d 58 (8th Cir. 1968). And we must accept as established all reasonable inferences to be derived from the testimony. Babb v. United States, 351 F.2d 863, 866 (8th Cir. 1965); Jaben v. United States, 349 F.2d 913, 917 (8th Cir. 1965).

■ The testimony here clearly points to the defendants as perpetrators of the burglary—their meeting at the Bond home in the late afternoon prior to the crime; their statements there and the purchase of work gloves for a codefendant by Mrs. Bond; the finding of a similar glove at the scene of the crime; the lack of fingerprints; the rental of the acetylene equipment, found in front of the bank, by men in a Ford automobile bearing the same license number as that on the Buick being driven by defendants at the time of their apprehension; the strong resemblance of one of the defendants to one of the men who rented the acetylene equipment; the time and place of defendants' apprehension as related to time of robbery and reporting of the burglary; the reckless and furtive manner in which defendants drove the Buick; the condition of their clothing upon apprehension; and the later hiding of a pair of trousers under defendant Mathes' mattress, the chemical analysis of which reflected that particles taken therefrom were similar to those found in the bank. In the light of the totality of this testimony, it cannot be said that the jury was unwarranted in drawing the reasonable inference that the defendants were guilty of the crime with which they were charged. It could hardly conclude otherwise, and we have no difficulty in holding that the evidence sufficed to support the verdict.

*Evidentiary Rulings.*

Defendants next contend that the testimony of arresting officer Victor Phillips concerning the physical appearance of the defendants and the condition of their clothing at the time of the arrest should have been suppressed because the arrest was unlawful and illegal, inasmuch as Phillips was an officer of a third class city and did not have the authority to make an arrest for a felony without a warrant, and, further, that he had no probable cause for the arrest.

Missouri law governs the authority of a policeman of cities of the third class. Section 85.561 V.A.M.S. clearly designates members of the police departments of third class cities as peace officers under subsection (1) thereof which provides:

"85.561. Police officers, conservators of peace-supervision-powers and duties (third class cities)

"1. In all third class cities the members of the police department shall be conservators of the peace, and shall be active and vigilant in the preservation of good order within the city."

The Supreme Court of Missouri has defined the powers of a peace officer in the case of State v. Berstein, 372 S.W.2d 57, 59 (Mo.1963), cert. denied, 376 U.S.

953, 84 S.Ct. 970, 11 L.Ed.2d 972 (1964), as follows:

"It has long been the rule in this state, and many cases set it forth, that a peace officer may arrest without a warrant anyone who he has reasonable grounds to believe has committed a felony. (Citing cases.) The officer may arrest any person upon suspicion who is in fact guilty of a recent felony, whether the officer be advised of such felony or not. (Citing cases.)"

 It is well settled that a peace officer has the authority to arrest without a warrant anyone who he has reasonable grounds to believe has committed a felony. The question of whether he had probable cause (reasonable grounds) to make the arrest without a warrant is determined by federal standards. If the arrest were made without probable cause, the evidence must be suppressed. Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Dupree v. United States, 380 F.2d 233 (8th Cir. 1967); Pigg v. United States, 337 F.2d 302 (8th Cir. 1964).

 In the instant case, we find that officer Phillips had probable cause to make the arrest. The officer knew that suspected burglars had been seen at the bank. He was directed to watch the road leading from the bank which was burglarized. He saw a car with its lights out, swerving along a road leading from Lohman, Missouri at 5:05 a. m. and pulled in behind it to get the license number for an ownership check. When Phillips stopped the car within the Jefferson City limits, he found that, although the license had been issued to Billy Mason, he was neither the driver nor one of the other occupants. The

dispatcher had also radioed that the license number on the car had been issued for use on a Pontiac, but defendants' car was a Buick. Phillips saw the driver lean over quickly to the right hand side of the car and then sit up in a manner which aroused the officer's suspicion. He later found two .38 caliber revolvers in the glove compartment of the car, but the revolvers were not offered into evidence. Further, Phillips observed soot on the clothing and faces of the defendants, and also observed that the car had no key in the ignition. Under these conditions, he could have arrested the defendants for either suspicion of bank robbery or for suspicion of auto theft. The fact that he arrested them for suspicion of auto theft and later they were charged with bank robbery is immaterial, and the original arrest is not invalidated because an additional and different offense was later revealed. Cf. Dupree v. United States, supra.

To paraphrase Judge Blackmun's observation in Rodgers v. United States, 362 F.2d 358, 362 (8th Cir. 1966), we are not willing, even in this day of critical review of all police operations, to hold that this investigation was improper or not in the line of the officers' duty or violative of defendants' fundamental rights. See also and compare Schook v. United States, 337 F.2d 563 (8th Cir. 1964).

Thus, the testimony of officer Phillips' observations of the physical appearance of the defendants and their clothing at the time of the arrest was properly admitted inasmuch as the arrest was legal.

 Defendants next challenge the district court's ruling admitting the testimony of officer Phillips on redirect examination wherein he stated that the defendants were originally arrested for suspicion of auto theft.[2]

---

2. The questions and answers arose in the following manner:
 "*CROSS EXAMINATION*
 \* \* \* \* \*
 "MR. KINGSLAND [Defendants' attorney]: I have one more question. Is that all right?

"MR. HOUDEK [Government's attorney]: Certainly. Anything you want.

"Q. (By Mr. Kingsland) Officer, Mr. Houdek referred to a report that was made by you, and I believe you referred

After a discussion out of the hearing of the jury between the court and the attorneys, the court instructed the jury that there was no charge in this case in connection with the theft of an automobile and that the evidence was not admitted for any reason except that it was a part of the circumstances which the jury would take into account in accordance with the full instruction given after all of the evidence. In its closing instructions, the court included an instruction about the testimony reflecting that the arrest was originally made for suspicion of auto theft:

"I also instruct you that there is no charge in this case about a stolen car or any stolen license plates. I mentioned to you during the trial that the single and sole charge here is that which I have read you and also to the question of the aiding and abetting under Section 2, which I have just instructed you about."

We do not agree that the questions and answers set out in the margin were in any way an insinuation of defendants' guilt of other crimes or in any way improper or prejudicial. In the first place, the question which was asked on redirect examination was not calculated to infer, and neither did it infer, that the defendants were guilty of other crimes, nor did it put into the minds of the jury that these defendants were "criminal types." The defense attorney had opened the door for the questions by inquiring whether the report showed that the defendants had been cited with a violation of a city ordinance and, following a negative answer, the government attorney on redirect examination had a right to ask the witness why the defendants were arrested under the doctrine of "verbal completeness." Babb v. United States, supra; Newman v. United States, 331 F.2d 968 (8th Cir. 1964), cert. denied, 379 U.S. 975, 85 S.Ct. 672, 13 L.Ed.2d 566 (1965); Smith v. United States, 224 F.2d 58 (5th Cir. 1955), cert. denied, 350 U.S. 885, 76 S.Ct. 138, 100 L.Ed. 780 (1955). Secondly, the court properly instructed the jury at the time of the question that the answer was not to be considered evidence of defendants' guilt of this or any other crime, but that it was only a circumstance which they were to consider in arriving at a verdict in this case wherein the defendants were charged with bank robbery. Again, in its final instructions, the court admonished the jury not to consider this testimony as evidence of another crime. Any relevant and competent evidence of guilt is not rendered inadmissible because it also tends to show the accused committed other offenses. See Babb v. United States, supra, 351 F.2d at 867.

In our opinion, the court properly admitted the testimony and properly instructed the jury concerning this testimony, and the defendants were not prejudiced in any way.

Finally, defendants contend that the court erred in admitting the

---

to that report in your direct examination. Is that correct?

"A. Yes, sir.

"Q. And is that a copy of the report made by you?

"A. Yes, sir.

"Q. And is that your signature at the bottom of the report?

"A. I believe it is, sir.

"Q. Now, Officer, in that report is there any mention at all of any violation of City ordinances by this car that you observed that morning?

"A. No, sir.

"Q. And was the driver of this car ever given a summons for an ordinance violation?

"A. No, sir.

"MR. KINGSLAND: I have no further questions.

"*REDIRECT EXAMINATION*

"BY MR. HOUDEK:

"Q. Why did you arrest the defendants?

"MR. KINGSLAND: I am going to object to that; calls for a self-serving statement.

"MR. HOUDEK: He has asked him—

"THE COURT: It is within the scope. Objection overruled. You may answer.

"A. For investigation of auto theft."

testimony of Carol Bond concerning the circumstances of her husband's disappearance, her lack of knowledge as to his present whereabouts, and her futile efforts to locate him, as this evidence was wholly irrelevant and prejudicial to the rights of these defendants then on trial. Defendants argue that since all defendants, including Bond, were arrested in the same car shortly after the commission of the crime, this testimony concerning the absence of Bond could lead the jury to the conclusion that the absence of one defendant not on trial was a strong indication of the guilt of the defendants then being tried.

We do not agree with this contention. Certainly, the Government had the right to put on evidence as to the whereabouts of a codefendant who is charged in the same indictment as the defendants then on trial. However, even conceding for the sake of argument that the testimony was irrelevant and immaterial to the case at bar, it did not prejudice the defendants. The jury could have just as reasonably drawn the inference that the defendants were not guilty because they were present as to draw the inference, as defendants suggest, that they were guilty because Bond was absent. After Carol Bond's testimony, the jury knew that the men had been out on bail since their arrest, and that they did not absent themselves as Bond did.

The Government had called Mrs. Bond to testify to conversations concerning her husband's whereabouts which she had had with defendant Kayser. Due to previous interviews with government attorneys, it was expected that this testimony would be an admission against Kayser's interest. However, she did not testify as expected and, therefore, the court ruled that counsel for the Government could refresh her memory by asking her questions about her husband's whereabouts.[3] Under the circumstances, the questions were proper. After a close examination of the record, it appears that Mrs. Bond did not testify in any manner concerning the whereabouts of her husband or any conversations with the defendants that would prejudice them.

Our canvass of the record evidence in light of the defendants' contentions convinces us that the defendants were given

---

3. (Carol Bond—Direct)

"Q. (By Government attorney) All right, do you know where your husband is now?

"A. No, I don't.

"Q. When was the last time you saw him?

"MR. KINGSLAND: Your Honor—Judge, may we approach the bench?

"(WHEREUPON, the following proceedings were had in the presence but out of the hearing of the jury:)

"MR. KINGSLAND: Your Honor, we would like to object to this whole line of inquiry as to when she last saw her husband or as to where her husband might be, is totally outside of the scope of any of the issues in this trial and could plant prejudicial ideas in the jury's mind.

"THE COURT: How does the prejudice come in?

"MR. KINGSLAND: Well, I gather, Your Honor, that the jury might get the idea, as has been intimated around, that he has met with foul play, Your Honor, but I don't see where it is relevant to any of the issues in this trial in any event as to whether he is here, there or anywhere.

"THE COURT: What do you expect the witness to testify?

"MR. HOUDEK: That she does not know where he is, that she has hunted for him, that she made a telephone call to Tom Kayser's residence, that the phone was answered by Tom Kayser's wife, and that she later in conversation spoke with Thomas Kayser, that in response to a question as to where her husband was, Thomas Kayser said that, 'That dirty son-of-a b.... had turned State's evidence against us.'

"THE COURT: Why don't you just ask her if she attempted to locate him? I think the jury ought to be told that the Defendant Bond's whereabouts are unknown, is the reason why he is not in the courtroom and it is just that simple; notified for trial and bond was forfeited. I don't know that it is even important to advise the jury that the bond was forfeited."

a fair trial, completely free of prejudicial error.

The judgments of conviction are affirmed.