**Louis SACHS and Ralph Sachs, Appellants,**

v.

**UNITED STATES of America, Appellee.**

No. 19357.

United States Court of Appeals
Eighth Circuit.

June 18, 1969.

Edward Bennett Williams, Washington, D. C., for appellants; Harold Ungar, Sandra Terzian, Washington, D. C.,

Morris A. Shenker and Bernard J. Mellman, St. Louis, Mo., on the briefs.

Roger Edgar, Sp. Asst. U. S. Atty., St. Louis, Mo., for appellee; James E. Reeves, U. S. Atty., and Veryl L. Riddle, Sp. Asst. U. S. Atty., on the brief.

Before BLACKMUN, GIBSON and BRIGHT, Circuit Judges.

GIBSON, Circuit Judge.

Ralph and Louis Sachs appeal from judgments of conviction entered in the United States District Court for the Eastern District of Missouri where a jury found each defendant guilty of six counts of using the mails in furtherance of a scheme to defraud in violation of 18 U.S.C. § 1341 and one count of using an assumed name while so using the mails in violation of 18 U.S.C. § 1342. Each defendant was sentenced to ten years—concurrent five-year terms on four of the counts, to be followed by five-year concurrent terms on the remaining three counts.

We affirm the judgments of conviction.

The Sachs brothers and their wives were the principal stockholders, directors and officers of a group of small loan companies, three of which are involved in this case. Louis and Ralph Sachs were the president and secretary-treasurer, respectively, of Mid-Continent Finance Corporation encompassing the following business entities: the home office at St. Louis, Missouri, d/b/a Allied Finance Company; a wholly owned subsidiary, Kennett Finance Company, at Kennett, Missouri; and two branch offices in Tennessee. In addition, defendants operated the Clayton Insurance Agency from the home office as an adjunct to their money lending business. Between 12 and 15 people, in addition to the defendants, were employed at the home office.

The transactions involved in this case followed a pattern. When Mid-Continent held a customer's note, either through a direct loan or by purchase from a retail establishment that had extended credit to the customer, the customer was afforded the opportunity of purchasing credit life insurance. Mid-Continent established a business relationship with National Home Life Assurance Company and the Equitable Life Assurance Society, so that Clayton Insurance, as agent, could write credit life policies. Clayton Insurance retained 50 per cent of the premiums of each policy as commissions. The credit life insurance policy was written for the anticipated term of the loan to insure repayment in the event of the borrower's death. If the borrower were delinquent, so that the loan ran longer than expected, the insurance would lapse unless a new policy was purchased at an additional premium for the additional anticipated term. If the borrower prepaid the loan, a refund would be due on the premium for the unused term of the policy.

Two types of credit life insurance policies were written. One was a straight term policy on the borrower's life for the full amount of the loan for the projected period of the loan. The principal amount did not decline as payments were made. Upon the death of the insured borrower, the insurance company would pay the full amount of the policy. An amount equal to the unpaid balance on the loan would be paid to the lender, and presumably the balance to the borrower's designated beneficiary or his estate. The second type of policy was the reducing or declining balance type which paid to the lender upon the borrower's death only the amount of the unpaid balance of the loan. Credit life policies were issued automatically upon application without reference to age, health, or any inquiry concerning the insurability of the borrower, the only requirement being the payment of the premium, the amount of which was fixed by a predetermined formula.

The defendants testified and admitted a double collection of six loans. When the borrower died the amount of the balance remaining on the loan was collected twice—from the insurance company, under the credit life policy on the borrow-

er's life, and again from the estate or co-maker of the borrower or else the excess insurance proceeds were appropriated by the defendants. In three of the loans the borrower had purchased a full amount credit life insurance policy and, although Mid-Continent collected the full amount of the policy when the borrower died, the widow beneficiary never received her share.[1] In two of the loans, the borrower had purchased a declining balance policy and, although Mid-Continent received the outstanding balance from the insurance company when the borrower died, the collection department continued collecting from the surviving widow.[2] In the remaining loan, the borrower had refused to purchase credit life insurance. Allied Finance, without the knowledge of the borrower or the co-makers, purchased a declining balance policy on the borrower's life, and after the borrower's death collected insurance proceeds in the amount of the balance outstanding on the loan. Allied also collected the balance of the loan from the borrower's widow.[3] As to this double collection, the defendants freely admitted responsibility on appeal [4] contending they proceeded on the advice of their attorney and that such a double collection is legal under Missouri law. As to the other five double collections, the defendants attributed each incident to innocence or inadvertent clerical error.

The jury found the defendants guilty of fraud in each of the above double collections. In addition, the jury found each guilty of using an assumed name in the promotion of a scheme to defraud. The defendants did not deny that assumed names were used on collection letters, but contended that such was a common office practice with collectors at Allied Finance. Also, they unsuccessfully attempted to disassociate themselves from the practice by placing the onus on their employees.

On this appeal defendants urge (1) motions for acquittal should have been granted as to Count II (the Costello loan), as collection of the amount of the loan from both Mrs. Costello and the insurance company was legal under Missouri law; (2) denial of the motions for acquittal as to Count II requires reversal as to the other counts as well, as the government argued to the jury that defendants' admission of the facts involved in Count II was an admission of the scheme-to-defraud element of the offenses charged in all of the counts; (3) the trial court erred in failing to give defendants' requested "accomplice instruction" and (4) defendants' requested "interested informer" instruction; and (5) motions for acquittal should have been granted as to Count VIII, defendants' use of assumed names in the alleged scheme, since there was no evidence defendants were responsible for the particular uses of the names charged, and, even so, there was no showing that the use of assumed names materially contributed to the alleged fraudulent scheme.

█ At the outset we note the well-established rule that where concurrent sentences are imposed on several counts and the sentence does not exceed that which could have been imposed under a single count, the judgment may be affirmed if the conviction on any of the counts is valid. Roviaro v. United

---

1. Count III, Mrs. Smith, defrauded of $282.70; Count V, Mrs. Lewis, defrauded of $443.25; Count VI, Mrs. Arnold, defrauded of $77.83.

2. Count I, Mrs. Burress, defrauded of $201.88; Count IV, Mrs. Downs, defrauded of $525.00.

3. Count II, Mrs. Costello, defrauded of $5,280.

4. At the trial, however, defendants first contended that the insured borrower had not signed the note and they were just gambling their premium against the insurance company's risk on the borrower's life; and that in purchasing the insurance they did not intend to effect a double collection in the event of his death. However, after receiving the insurance proceeds, defendants had second thoughts in the matter and aggressively proceeded to again collect the account.

States, 353 U.S. 53, 59, 77 S.Ct. 623, 1 L.Ed.2d 639 n.6 (1957); White v. United States, 399 F.2d 813, 815 (8 Cir. 1968); Jacobs v. United States, 395 F. 2d 469, 473 (8 Cir. 1968); Cave v. United States, 390 F.2d 58, 70 (8 Cir. 1968), cert. denied 392 U.S. 906, 88 S.Ct. 2059, 20 L.Ed.2d 1365.

In this case, concurrent sentences were imposed upon each defendant with regard to four of the counts—Count I, the Burress loan; Count III, the Smith loan; Count V, the Lewis loan; and Count VIII, use of assumed names on dunning letters sent to Mrs. Burress. Additional sentences were imposed with respect to three of the counts—Count II, the Costello loan; Count IV, the Downs loan; and Count VI, the Arnold loan— concurrent as to each other but consecutive as to the sentences on the other four counts. Thus, it must merely be determined that a conviction was proper upon at least one count in each group in order to affirm the judgments. Atkinson v. United States, 344 F.2d 97, 98–99 (8 Cir. 1965), cert. denied 382 U.S. 867, 86 S.Ct. 141, 15 L.Ed.2d 106. We will, however, discuss more than two of the counts in order to cover all issues raised by defendants, but not all of the counts.

■ This being a jury case and the verdict having been in favor of the government and against defendants, the general rule is that the evidence must be viewed in a light most favorable to the government as the prevailing party and all reasonable inferences that tend to support the verdict of the jury must be accepted as established. Hanger v. United States, 398 F.2d 91, 108 (8 Cir. 1968); Jacobs v. United States, 395 F. 2d 469, 472 (8 Cir. 1968); Kayser v. United States, 394 F.2d 601, 604 (8 Cir. 1968), cert. denied 393 U.S. 919, 89 S.Ct. 250, 21 L.Ed.2d 206.

With the above rules in mind, we examine the evidence with regard to one of the counts in each group and the Costello loan to determine if the jury could validly find the defendants guilty of mail fraud. We note that the use of the mails in carrying out the alleged scheme to defraud is apparent and is not in issue. Also, all of the double collections of insurance proceeds and loan balances, including insurance payments belonging to borrowers, are well established and in fact admitted. Defendants in their reply brief perceive the issue as: "The material issue here was not whether the double collections took place, but whether the Sachs brothers were guilty participants in them."

## COUNTS I and IV

Dorothy Burress (Count I) of Dunkirk, Indiana, testified that she and her husband borrowed $700–$800 in the summer of 1962 to finance a home improvement. The home loan contract was acquired by purchase by Allied Finance Company. The account was insured with credit life insurance of the declining balance type by the Equitable Life Assurance Society. At the time of Mr. Burress' death in May 1963, the unpaid balance on the loan was $750.26. Mrs. Burress' nephew wrote to Allied Finance shortly after Mr. Burress' death and explained that Mrs. Burress would need some time before commencing payments.

Clara Wells, a young woman employed by defendants in the home office, was primarily responsible for the preparation of claim forms and other necessary papers to be submitted to the insurance company upon the death of a borrower. Clara Wells testified that she was instructed by Louis Sachs to prepare a claim form to be submitted to Equitable Life to claim the proceeds of the credit life insurance policy on the Burress' loan. She prepared the claim and submitted it to Louis Sachs who signed it in her presence. Shortly thereafter, Allied Finance received a check from Equitable Life for $750.26.

After receiving the insurance check, Louis Sachs dictated to Clara Wells the following letter addressed to Mrs. Burress under date of June 14, 1963: "Sorry to hear you have had such bad luck. When do you believe that it will be convenient for you to make payments?

Yours very truly, Allied Finance Company, [signed] C. Graham, Collection Manager." The name "C. Graham" was the name of a former employee of Allied Finance. Clara Wells further testified that Louis Sachs knew that the insurance proceeds had been collected, and he told her that the letter was being sent to determine whether Mrs. Burress was aware that insurance existed.

Mrs. Burress obtained employment and began making regular payments to Allied Finance, although a few payments were missed. The government introduced letters from Allied Finance to Mrs. Burress under dates of October 3, 1963, June 12, June 17, June 26, and July 6, 1964; four of the letters were dunning letters signed by "R. Tracy" or "J. Lewis", and one letter signed by "D. Sanders" urged Mrs. Burress to purchase credit life insurance to insure her account. Clara Wells testified that "R. Tracy" and "J. Lewis" were assumed names used by Ralph Sachs and Louis Sachs, respectively, in collection matters. During this period Mrs. Burress also received several collect telephone calls from Allied Finance urging her to make prompt payments. Mrs. Burress paid $201.88 before she ceased making payments after learning that credit life insurance had been in force at the time of her husband's death.

Mrs. Marguerite Downs (Count IV) and her husband went to the home office of Allied Finance in March 1961 and after meeting with Ralph Sachs borrowed $1400, giving a mortgage on their furniture. Declining balance credit life insurance was purchased. At the time of Mr. Downs' death in April 1963, $525 remained outstanding on the account. On June 6, 1963, Mrs. Downs went to the office of Allied Finance and inquired whether the credit life insurance would pay off the loan. Ralph Sachs told Mrs. Downs that the insurance had expired one month earlier and he said that $525 would settle the account. Mrs. Downs, utilizing a portion of insurance proceeds received from another source, paid Ralph Sachs the $525 requested.

In fact, however, Louis Sachs had directed the renewal of the Downs' insurance policy, had dictated to Clara Wells a letter to National Home Life on the death claim, and Allied Finance had received a check dated May 23, 1963, in the amount of $500 in settlement of the claim.

▪ We conclude that the evidence justifies the jury's finding that the defendants Louis and Ralph Sachs were guilty of using the mails to defraud in connection with the loan and credit life insurance transactions involving Mrs. Burress and Mrs. Downs. Thus, a determination of the validity of the other counts is not necessary as the judgments of conviction on Counts I and IV sustain the sentences imposed.

Defendants contend, however, that the invalidity of Count II vitiates all counts as the defendants' admission of the facts involved in the Costello loan was argued to the jury as an admission of the scheme-to-defraud element of the offenses charged in all of the counts. Even assuming *arguendo* that double collection of the Costello loan was technically legal as not coming within the ambit of proscribed conduct under the Missouri law, we believe (1) reversal of the other counts of conviction is not warranted; and (2) the evidence adduced as to the Costello transaction was relevant and was properly placed before the jury as showing a common scheme or pattern of operation.

Even if the evidence were improperly received, a reversal of the other six counts of conviction would not be warranted. Six separate and distinct instances of fraudulent double collection were charged against the defendants. The trial judge carefully instructed the jury:

"* * * [A] separate crime or offense is charged in each count of the indictment. Each offense and the evidence applicable thereto should be considered separately as to each defendant. The fact that you may find one of the accused guilty or not guilty

of one of the offenses charged should not control your verdict with respect to any other offense charged or with respect to the other defendant.

"It is necessary for you to make a separate finding of guilt or innocence with respect to each count in which a defendant is charged, and if your finding is of guilt, it must be based upon your so finding beyond a reasonable doubt."

In each instance of double collection, save the Costello transaction, the defendants claimed innocence and clerical error. The government refuted defendants' claims to the jury's satisfaction by the use of competent evidence from which the jury could find that the double collections were effected by the defendants with the requisite fraudulent intent. A separate finding as to each of the counts was rendered by the jury. As stated in Tyler v. United States, 397 F.2d 565, 570 (5 Cir. 1968):

"Each count of an indictment is an entity, and each verdict rendered on each count is an entity. See Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932); United States v. Russo, 335 F.2d 299, 301 (7th Cir. 1964), cert. den. 379 U.S. 962, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965)."

In Hartwell v. United States, 107 F.2d 359 (5 Cir. 1939) the Court considered the situation where the validity of two counts of conviction was at issue as not charging an offense under a statute making unlawful false statements with intent of influencing action of the F.H.A. A third count of conviction charged violation of the mail fraud statutes by the sending of a letter containing the same false statements to a bank. The Court held at 361 of 107 F.2d:

"But, if we are wrong in these views as to the validity of the first and second counts, this will not avail appellant, for convicted on a general verdict and given a sentence which could have been imposed under any one of the three counts, his conviction must stand if he was properly charged with an offense on the third count * * *."

However, we believe the evidence was relevant to show intent and knowledge and to refute defendants' claim of innocence of the other counts of double collection. In Moses v. United States, 297 F.2d 621 (8 Cir. 1961) the defendant was charged with instigating transactions out of which two false completion certificates were made for property loans insured by the F.H.A. The Court admitted testimony regarding a similar transaction instigated by the defendant, a transaction, however, where no fraudulent completion certificate was signed, holding at 623–624 of 297 F.2d:

"It is a general rule that evidence of a crime for which an accused has not been charged in the indictment is inadmissible and constitutes prejudicial error. * * * But where intent and knowledge are essential in proving the offense charged, evidence of transactions so connected with the charge * * * and evidence of other acts similar in nature tending to establish intent and guilty knowledge of the offense in issue * * * are two well established exceptions."

See also, Brickey v. United States, 123 F.2d 341 (8 Cir. 1941).

### Count II

We believe the evidence on Count II was not only properly admitted, but that the convictions thereunder were valid. After Joseph Costello refused to take out credit life insurance, Louis Sachs purchased a policy of the declining balance type on the life of Joseph Costello, without Costello's knowledge. The policy was issued by National Home Life and the $75 premium was paid by Allied. Upon Joseph Costello's death during the term of the loan, Louis Sachs instructed that a proof of loss be filed with the insurance company for payment. The insurance company issued its draft in the amount of $4,317, which was the amount of the unpaid balance of Costello's loan.

After Allied received the insurance proceeds, Mrs. Barbara Costello was called to defendants' office in St. Louis and Louis Sachs represented to her that the note was in arrears and insisted that the unpaid balance of the loan be renegotiated. Mrs. Costello acceded to this demand and executed a new note in the principal amount of $4320 to which $950 was added for interest, making a total amount of $5280. Mrs. Costello paid off this renegotiated note in full before she learned through Dave Ludwig, an accountant, that the insurance company had made payment of the unpaid balance of the Costello loan to Allied.

Mrs. Costello subsequently filed a civil action against the defendants for fraud, asking both compensatory and punitive damages. This suit resulted in a jury verdict against the defendants for $5,000 compensatory damages and $10,000 punitive damages. This case was not appealed and the judgment was settled for $12,000.

Now for the first time on appeal and in spite of the civil suit judgment for some $15,000, the defendants contend that the collection of the renegotiated note from Mrs. Costello was legal under Missouri law. This issue could properly be dismissed since it was not raised in the trial court. However, we will examine the issue on defendants' contention of plain error.

The defense interposed to this count in the trial court was that the defendants were acting under advice of counsel, now deceased, to the effect that Mrs. Costello could not take advantage of the insurance company's payment of Mr. Costello's account in satisfaction of her contractual liability on the note.

The basis for defendants' legal contention on appeal is Wells v. Thomas W. Garland, Inc., 39 S.W.2d 409 (Mo.App. 1931). In *Wells*, which was a bailment case involving a fur coat, the Court held that the bailee under the bailment contract was an insurer and it could not take advantage of an insurance payment made by plaintiff's insurance company to cover the loss of the coat. Plaintiff had subrogated her claim against the bailee to her insurance company. There was no attempt to effect a double collection. The Court did hold that the bailee storage company was a stranger to the insurance contract and it was of no concern to it whether the bailor had recovered upon her policy or not. The Court went on to hold at 412 of 39 S.W. 2d: "* * * [O]ne who is to be held to indemnity for his own wrong or breach of legal duty will not be heard to ask that the damages otherwise recoverable from him be mitigated to the extent of the insurance collected by the injured party," citing a number of Missouri cases applying this principle in the tort field. The Court then applied the principle applicable in tort cases to this bailment case.

On this basis defendants argue that if Mrs. Costello's legal liability on the note remained, the collection of that liability could not constitute a fraud and the use of the mails in connection therewith would not be illegal. We are not persuaded in the least. *Wells* is a bailment case, with no question of double recovery, no question of insurable interest. It is not at all concerned with the law applicable to insurance contracts and in particular credit life insurance.

 If the double collection of the Costello loan amount were illegal under Missouri law the judgment of conviction on Count II should stand. In Missouri, as in most states, a party must have an insurable interest in the matter insured to effect a valid contract of insurance. A creditor does have such an insurable interest in the life of his debtor to the extent of the debt plus the amount of the insurance premium advanced by the creditor, and if an amount in excess of the debt is received by the creditor he holds such excess in trust for the debtor or debtor's estate. Strode v. Meyer Bros. Drug Co., 101 Mo.App. 627, 74 S. W. 379 (1903); see, 115 A.L.R. 741, 745–748, Anno: Life Insurance for Benefit of Creditor (1938).

In *Strode* the creditor took out a $5,000 life insurance policy to cover a small indebtedness of about $100 plus interest. The policy was made payable $50 to the estate of the insured and $4950 to the creditor. Premiums totalling $299.40 were paid by the creditor. Upon the debtor's death the creditor collected and claimed the right to all of the insurance proceeds except $50. The debtor's estate sued to recover from the creditor all of the insurance proceeds except a sum sufficient to cover the debt, interest and premium cost. The Court in following prior Missouri decisions said at 381 of 74 S.W.:

"* * * [B]y the law in this state appellant's [creditor's] interest in the policy did not exceed what Stokes [debtor] owed it, plus the amount of premiums it paid and interest, as we had occasion to point out recently in a similar controversy. The construction our courts put on such transactions as we have here is that the creditor, whether he be named as payee of the policy when it is issued, or becomes the payee afterwards by assignment, acquires the status of beneficiary as far as is necessary to make him whole, and no further. As to the remainder of the insurance money, he stands as trustee for the estate of the insured, or whomsoever the insured may have validly appointed to be residuary beneficiary. [Citations omitted.]

* * * * * *

"The law views the contract of insurance as having been made for the benefit of the appellant [creditor] to the extent of its interest in Stokes' [debtor's] life, and for the benefit of Stokes' estate as to the excess of the fund realized from the policy."

The legal principles set forth in *Strode* are relatively simple and clear. They represent the controlling law applicable to creditor-debtor life insurance policies and govern the case at bar. The debt plus any premium[5] paid by the creditor is the sole basis and the complete extent of the creditor's insurable interest in the life of a debtor. Any insurance proceeds received by the creditor must be applied to the debt and any excess belongs to debtor's estate or beneficiary. Thus where the policy proceeds are sufficient to pay the debt and premiums, if paid by the creditor, the debt is extinguished. The defendants had no right under Missouri law to make any further collection against Mrs. Costello on the Costello loan.

In Morrow v. National Life Ass'n of Des Moines, Iowa, 184 Mo.App. 308, 168 S.W. 881 (1914) these same principles were reiterated with a review of the authorities in Missouri and elsewhere, the Court holding at 883 "that the beneficiary can only collect *for his own use,* or retain, in case he collects all, an amount equal to the insured's indebtedness to him."

Since the validity of a credit insurance policy depends upon the existence of a debt owing to the beneficiary of the policy, the insurance contract in the debtor-creditor relationship cannot be considered as independent and apart from the debt transaction. If the insured debtor died, it would appear that the creditor is then placed in the position where he has the option to obtain the insurance proceeds or to proceed against the debtor's estate or co-obligor. If the creditor accepts the insurance proceeds, these must be applied against the debt as the insurance contract depends upon the debt for its validity.

The defendants' actions initially were in accord with these general principles. Louis Sachs acknowledged that he had taken out the credit life insurance policy on Costello's life only to have security in the event that they would not be able to collect the account. In response to the question: "At the time that you bought the insurance did you at

---

5. It is immaterial whether the debtor or creditor pays the premiums and even whether the debtor knows about the insurance contract. Morrow v. National Life Ass'n of Des Moines, Iowa, 184 Mo. App. 308, 168 S.W. 881, 883 (1914).

that time expect to keep the proceeds of it, as well as collect on your note?" Sachs answered, "Oh, no." At the trial Louis Sachs first contended that Joseph Costello was not obligated on the loan transaction. This contention was proved incorrect. Then Louis Sachs testified that after receiving the insurance draft on Costello's life he did not know exactly how to handle it so he discussed the matter with his attorney, who allegedly told him that Allied Finance could keep the proceeds as it paid the premium and it could collect the indebtedness again from Mrs. Costello. The defendants at the trial asserted lack of criminal intent, relying upon the advice of their deceased counsel. This issue was properly submitted to the jury under the following instruction:

"If a man honestly and in good faith seeks advice from an attorney as to what he may do in a matter, and in good faith honestly follows such advice, relying upon it and believing it to be correct, and only intends that his acts shall be lawful, he does not possess the specific intent required, even if such advice were an inaccurate construction of the law."

■ Although not controlling, the parties including defendants and the government, appeared to be in agreement at the trial that the subsequent collection from Mrs. Costello was illegal. Louis Sachs, in testifying on cross-examination about the civil suit brought by Barbara Costello against defendants, admitted that the jury returned a verdict in Mrs. Costello's favor of $5,000 actual damages plus $10,000 punitive damages. His lawyer at the trial properly and with alacrity informed the Court that he was not the lawyer who advised Sachs to keep the insurance proceeds and also enforce collection against Mrs. Costello. It would also appear that the civil suit which resulted in a

jury verdict on this very issue of an illegal collection or exaction against Barbara Costello would be determinative on this legal point but not, of course, on the criminal intent to defraud necessary for conviction on Count II. The civil judgment was not appealed or reversed and was subsequently settled. Criminal intent, however, was amply established by other evidence.

## ERRORS IN INSTRUCTIONS

■ Defendants' third contention is that the District Court erred in refusing to give the defendants' requested "accomplice instruction." [6] Defendants argued strenuously at the trial and reiterate here that Clara Wells and Paul Rouillard, former bookkeeper at Allied Finance, were the parties guilty of criminal conduct in the double collections. They assert that the testimony of Clara Wells in the civil suits, repeated at the criminal trial, established "that her participation in the charged transactions was active, voluntary, and with knowledge or belief that they were illegal."

The defendants now agree that a fraud has been perpetrated upon all of their borrowers named in the complaint with the exception of Mrs. Costello in Count II. They attempt, however, to picture themselves as innocent and the frauds as having occurred by either the inadvertence or the willful fraudulent acts of their employees. The employees, of course, including Clara Wells, were under the sole control and direction of the defendants. The record shows that the defendants were ready and eager to prey upon naive and unsophisticated widows by taking insurance proceeds belonging to them.

The Lewis loan (Count V) was a particularly aggravated swindle practiced upon a borrower of extremely limited resources. Thomas and Dorothy Lewis secured a loan from Kennett Finance Com-

---

6. The defendants requested the Court to instruct the jury that:
"An accomplice is one who voluntarily participates in the commission of the crime. You are instructed that the testimony of an accomplice should be closely examined and weighed with caution and great care."

pany in Kennett, Missouri. Thomas Lewis drowned while fishing in the Mississippi River. Dorothy Lewis informed James Collier, the resident manager, of her husband's death and cooperated in making the insurance claim. The insurance in this case covered the original amount of the loan and the insurance company issued a $700 check to Allied. The unpaid balance on the loan at the time of Mr. Lewis's death was $256.75. Collier testified on direct examination that Louis Sachs directed him to credit $256.75 on the Lewis account, closing it out, and to issue a check in the amount of $443.25, representing the widow's portion of the insurance proceeds, to the order of Dorothy Lewis. Collier was further instructed by Sachs to secure Dorothy Lewis's endorsement on the check and credit the proceeds to Kennett Finance's uncollected accounts. Collier prepared the check as directed and according to Mrs. Lewis presented the check to her face down with instructions to sign it in order to pay off her husband's account. Mrs. Lewis assumed that the check which she signed settled the loan account. She requested no further explanation and none was given. Collier said during the course of his direct examination that he recognized Louis Sachs' voice on the telephone in discussing the Lewis insurance proceeds transaction, but went on to say "Lou and Ralph [Sachs] sound a little alike." Collier later testified to another question concerning what party directed that the proceeds be appropriated: "To the best of my recollection it was Louis. Again, it has been a long time. It was either Lou or Ralph, or maybe Clara, but to the best of my recollection it was Lou." Clara Wells denied ever talking to Collier about the Lewis insurance. There is certainly no basis for classifying the young woman, Clara Wells, as an accomplice in this count or in any other count. There is no evidence that Clara Wells devised the fraudulent scheme of double collections or of appropriating insurance proceeds properly belonging to the borrowers' widows, nor is there any evidence that Clara Wells shared in defendants' unlawful gains. These fraudulent acts inured solely to the benefit of the defendants.

Therefore, we do not view Clara Wells as an accomplice. To characterize this young woman, who was merely doing her employers' bidding, as a criminal accomplice appears most unfair. The sordid business practices shown by the evidence were carried out under the direction of the defendants and for the sole benefit of the defendants. To attempt to transfer the blame to hired employees who must do the bidding of defendants in carrying out management's decisions has a particularly hollow ring. These frauds were perpetrated by defendants for their sole benefit and pecuniary gratification. The employees involved were mere instrumentalities used in carrying out the fraudulent scheme. They were not accomplices or informers in the proper legal denotation of those terms.

But even assuming that Clara Wells were an accomplice and that the charge requested by the defendants embodies a correct statement of the law (neither assumption being regarded as well taken by us), reversible error was not committed by the trial court in failing to give the requested instruction. In Esters v. United States, 260 F.2d 393, 397 (8 Cir. 1958), Judge Matthes stated the accepted rule:

"[W]e do not understand that an absolute and mandatory duty is imposed upon the court to advise the jury by instruction that they should consider the testimony of an uncorroborated accomplice with caution. See Caminetti v. United States, 242 U.S. 470, at page 495, 37 S.Ct. 192, at page 198, 61 L.Ed. 442, where the Court, in passing on a similar contention stated: 'In Holmgren v. United States, 217 U.S. 509, [30 S.Ct. 588, 54 L.Ed. 861] this court refused to reverse a judgment for failure to give an instruction of this general character, while saying that it was the better practice for courts to caution juries against too

much reliance upon the testimony of accomplices and to require corroborating testimony before giving credence to such evidence. While this is so, there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them.' " Accord, United States v. Finazzo, 288 F.2d 175, 176 (6 Cir. 1961), cert. denied 368 U.S. 837, 82 S.Ct. 37, 7 L.Ed.2d 38; Lyles v. United States, 249 F.2d 744, 745–746 (5 Cir. 1957), cert. denied 356 U.S. 931, 78 S.Ct. 773, 2 L.Ed.2d 761; United States v. Becker, 62 F.2d 1007, 1009 (2 Cir. 1933). See, Krulewitch v. United States, 336 U.S. 440, 454, 69 S. Ct. 716, 93 L.Ed. 790 (concurring opinion) (1949).

Defendants' fourth contention is that the District Court erred in refusing to give the defendants' requested "interested informer instruction." [7] Defendants point to the fact that Clara Wells, Rouillard (not called as a witness) and one Howard Hunt contacted the widows, except Mrs. Arnold, who were the victims of Allied's double collections and signed them to contingent-fee contracts predicated on the widows collecting punitive damages in civil suits brought against the defendants. For their efforts in management of the civil suits—hiring attorneys and presumably supplying documentary evidence from Allied's files— Clara Wells and Rouillard were to receive one-half of any punitive damages collected. The defendants were engaged in selling their business while the civil suits were pending and when the prospective buyers imposed a condition that all pending claims be disposed of, the five civil suits, involving $6,732.83 claimed compensatory damages, were settled for a total of $36,000. Defendants argue that Clara Wells' admitted involvement in the "claim-peddling scheme"—she would be financially benefited if the Sachs brothers were found civilly liable for the double collections—

committed her, out of a desire for self-preservation, to give testimony at the criminal trial of defendants that was consistent with the testimony she had previously given at one of the civil trials.

Defendants' contention is answered in Siglar v. United States, 208 F.2d 865, 867 (5 Cir. 1954), cert. denied 347 U.S. 991, 74 S.Ct. 854, 98 L.Ed. 1125:

"We reject the claim of error here made on the ground that the giving or refusal of such a charge is ordinarily within the discretion of the district judge, and its refusal will not be held to be error in the absence of a showing, not made here, that it has been abused. When the charge as a whole, particularly the charge as to the informer['s] * * * credibility, is considered in the light of the record made, we think it plain that the refusal of the charge was not error, prejudicial to appellant."

Accord, United States v. Hoffa, 349 F.2d 20, 52 (6 Cir. 1965), aff'd 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374, rehearing denied 386 U.S. 940, 87 S.Ct. 970, 17 L.Ed.2d 880; see, Rowell v. United States, 368 F.2d 957, 962 (8 Cir. 1966), cert. denied 386 U.S. 1009, 87 S.Ct. 1353, 18 L.Ed.2d 438. The trial court gave the usual instruction concerning factors to be taken into account by the jury in assessing the weight to be given to witnesses' testimony. Considering the fact that Clara Wells' connection with Rouillard and the civil suits was explored thoroughly by defense counsel on cross-examination of government witnesses and argued forcefully to the jury, we cannot say that in light of the charge given to the jury prejudicial error was committed by the trial court in failing to give the proffered instruction relating to the testimony of an "interested informer." The interest of Clara Wells

7. The defendants requested the Court to instruct the jury that:

"The testimony of an informer who provides evidence against a defendant for personal advantage or vindication must be examined and weighed by the jury with greater care than the testimony of an ordinary witness."

and some of the other employees in the civil suits against the defendants was properly and extensively brought out in the trial and it was a matter for the jury to consider in assessing credibility. The credibility of the witnesses was for the jury's determination. Clara Wells did not inform the government of these frauds, and was not an informer. She was not recruited, solicited, or paid by the government to obtain evidence or to testify.

## USE OF ASSUMED NAMES

Defendants' final contention is that the District Court erred in denying defendants' motions for acquittal as to Count VIII, defendants' use of assumed names in the fraudulent scheme, since there was no evidence that they were responsible for the particular uses of the names charged, and there was no showing that the use of assumed names materially contributed to the fraudulent scheme.

A determination on this point is not necessary to sustain the defendants' convictions and sentences (as discussed, *supra*). However, we note in passing that there was ample evidence in the record from which the jury could find that Mrs. Burress received dunning letters signed by "R. Tracy" and "J. Lewis" which were written at the direction of Ralph Sachs and Louis Sachs, respectively. Title 18 U.S.C. § 1342 requires only that the use of the assumed name be "for the purpose of conducting, promoting, or carrying on * * * any scheme or device mentioned in [the mail fraud statute]." Further, the assumed names contributed materially to the fraudulent scheme. The defendants could seek to avoid responsibility for, and disclaim any knowledge of, letters signed by "R. Tracy" and "J. Lewis" if the assumed names were used by many persons in defendants' office as was claimed by them. Pinpointing responsibility for the letters would obviously be made more difficult.

Defendants were represented by able and competent counsel, both at their trial and on appeal. Almost every considerable question has been raised in their defense. The experienced trial judge,[8] fully and fairly submitted the issues to the jury, which resolved all factual issues against the defendants. The record fully supports the judgments of conviction.

Judgment affirmed.

---

8. The Honorable James H. Meredith (E.D.Mo.).