429 F.2d 956
 UNITED STATES of America, Appellee,
v.
Jacki Eugene LEACH, Appellant.
UNITED STATES of America, Appellee,
v.
Robert Lewis FARRIS, Appellant.
UNITED STATES of America, Appellee,
v.
Roy Malcolm ROBERTS, Appellant.
UNITED STATES of America, Appellee,
v.
Carl Houston ROBERTS, Appellant.
 No. 19739.
 No. 19740.
 No. 19773.
 No. 19775.
 United States Court of Appeals, Eighth Circuit.
 July 23, 1970.
 Rehearing En Ban Denied in Nos. 19739, and 19740 August 13, 1970.
 Rehearing Denied on Nos. 19773, 19775 August 24, 1970.
 
 COPYRIGHT MATERIAL OMITTED Raymond A. Bruntrager, and Louis Gilden, St. Louis, Mo., on brief for appellants.
 John A. Newton, Asst. U. S. Atty., St. Louis, Mo., for appellee; Daniel Bartlett, Jr., U. S. Atty., on the brief.
 Before MEHAFFY, HEANEY and BRIGHT, Circuit Judges.
 MEHAFFY, Circuit Judge.
 
 
 1
 The four defendants appeal from their convictions under a two-count indictment, each count charging the assault of an officer of the Bureau of Narcotics with a dangerous weapon in violation of 18 U.S.C. § 111.[1] Count I charged an assault upon Dennis Moriariy (referred to in the transcript and in the government's brief as "Moriarty") and Count II an assault upon William McNamara. A sentence of ten years' imprisonment was imposed on each defendant under each count, said sentences to be served concurrently. The sentence imposed upon defendant Roy Roberts was made subject to 18 U.S.C. § 4208(a) (2), which makes him eligible for parole at such time as the board of paroles may determine. We affirm.
 
 
 2
 According to the government's witnesses, Agent McNamara entered a bar in St. Louis known as Robbie's Corner Tavern shortly after 10:00 p. m. on December 30, 1968, in the course of an official investigation for violation of the Federal Narcotics Act. The door was locked but Roy Roberts, one of the defendants, opened the door for him. He ordered a drink and sat there and talked with Roberts for a few minutes, stating during the course of the conversation that he was from Chicago. About fifteen minutes later, the other agent, Moriarty, and an informer by the name of Gentile came to the door and were admitted. They started playing the bowling machine and overheard Roy Roberts make a phone call requesting that Carl (his son) come to the tavern. A short time later the other three defendants, Carl Roberts, Jacki Leach and Robert Farris, came into the tavern. After a conversation with Roy Roberts, they told Gentile to get his friend out of there and that they did not want to do business with him any more. The agents heard a thud and saw Gentile on the floor. Roy Roberts pulled a pistol on Moriarty and asked him who he was. He replied that he was a Federal Narcotics Agent and showed his badge. Then Roberts said he didn't care who he was and hit him under the left eye with the gun. He then took Moriarty's gun and gave it to Leach who held the pistol on Moriarty. Carl Roberts remained at the front door and Roy Roberts went to McNamara and asked him who he was. When McNamara also replied that he was a Federal Narcotics Agent, Roberts said that he would kill him and cocked the pistol and pulled the trigger, but the gun malfunctioned. McNamara was then beaten about the head and hands by Roberts, causing him to fall to the floor. McNamara's gun also fell on the floor and was picked up by Roy Roberts and given to Farris, who held the gun on both agents. After McNamara had been knocked to the floor, Carl Roberts threw a chair at him and hit him in the head. He also had a pistol which he pointed at McNamara. McNamara received six or seven lacerations on his head and a broken finger. While Roy Roberts was assaulting McNamara, Leach and Farris hit Moriarty with their fists and Leach took his wallet containing $57.00, $55.00 of which was marked money belonging to the government. The officers then ran out the front door and were pursued by three men who went back inside as a car occupied by officers approached.
 
 
 3
 Agent William M. Clark testified that he was in charge of the investigation and that he and Agent Cutright proceeded to the tavern that night followed by the car occupied by Moriarty and Gentile. Clark drove past the tavern about a block and parked, keeping it under surveillance. He saw Moriarty and Gentile go into the tavern and saw three other men go inside about five minutes later. At about 11:00 p. m. he saw Agents McNamara and Moriarty and informer Gentile run out of the tavern followed by three men. Clark started his car and as he drove towards the tavern the three man went back inside. Clark and Agent Hoerner went to the door, identified themselves and tried to gain admittance, but were unable to do so. In a few minutes several police officers arrived and Hoerner broke a small pane of glass in the front door and shouted inside. Then someone replied, "Don't shoot, I'll open the door."
 
 
 4
 The door was then opened by Roy Roberts and he and the three other defendants were placed under arrest. After they were removed from the premises, it was searched. Agent McNamara's pistol and wallet were found under a rollaway bed in a small storage area at the back of the tavern which was connected to the bar by an open doorway. A Derringer and a .38 revolver were found back of the bar, and Moriarty's weapon was found in an empty beer case in the storage area.
 
 
 5
 Defendants urge eighteen assignments of error, all of which we have carefully considered but have found to be without merit.
 
 
 6
 Defendants admit that an assault on the federal officers took place, but contend that they did not know at the time that they were federal officers and that this is the crux of the case. Both officers testified that they did inform the defendants that they were federal officers and therefore there was ample evidence to support a jury finding that the defendants knew of their status at the time of the assault. Furthermore, it has been held that this is not a necessary element of proof. United States v. Wallace, 368 F.2d 537 (4th Cir. 1966), cert. denied, 386 U.S. 976, 87 S. Ct. 1169, 18 L.Ed.2d 136 (1967), and cases therein cited. See also and compare United States v. McGough, 410 F. 2d 458 (4th Cir. 1969); Burke v. United States, 400 F.2d 866 (5th Cir. 1968); and Pipes v. United States, 399 F.2d 471 (5th Cir. 1968).
 
 
 7
 Although conceding that each defendant was guilty of one assault, defendants contend that the trial court erred by permitting each of them to be charged for two offenses asserting that an assault upon both federal officers at the same time could only be one act of hindrance by each defendant and hence only one crime under 18 U.S.C. § 111, and that one count of the indictment should have been quashed. They cite in support of their view Ladner v. United States, 358 U.S. 169, 79 S.Ct. 209, 3 L. Ed.2d 199 (1958). Ladner is inapposite as the defendant there received two sentences to be served consecutively on his conviction of two separate assault charges. In the present case, however, the defendants' sentences on the convictions are to run concurrently. We have repeatedly held that a general sentence on several counts of an indictment will be sustained on appeal if the defendant has been properly convicted under any count which is good and which is sufficient in itself to support the judgment and sentence. Barenblatt v. United States, 360 U.S. 109, 115, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Lawn v. United States, 355 U.S. 339, 359, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Hirabayashi v. United States, 320 U.S. 81, 85, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); United States v. Sheehan, 428 F.2d 67 (8th Cir. 1970); Sachs v. United States, 412 F.2d 357, 360-361 (8th Cir. 1969); Pritchard v. United States, 386 F.2d 760, 763-764 (8th Cir. 1967); Isaacs v. United States, 301 F.2d 706, 733 (8th Cir. 1962). While there has been some criticism of the concurrent sentence doctrine,[2] it is still an accepted rule of law, and we therefore hold that in view of defendants' proper convictions on one charge of assault which is sufficient to support the sentences, it is unnecessary to consider the other charges but that the judgments and sentences will be sustained.[3]
 
 
 8
 Defendants contend that prejudicial error resulted from the failure of the trial court to sustain the defendants' motion for severance. Fed.R.Crim.P. 8(b), 18 U.S.C., provides that "two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Under the facts in this case, joinder was clearly permissible. See Tillman v. United States, 406 F.2d 930, 934 (5th Cir. 1969). Defendants contend, however, that when evidence concerning the theft of the stolen wallet was introduced against Leach, a severance should have been granted because there is a natural tendency to infer guilt by association, citing King v. United States, 355 F.2d 700, 704 (1st Cir. 1966). Where conduct upon which each of the counts is based is part of a factually related transaction or series of events in which all defendants participated, charges may be properly joined although various offenses were distinct and defendants were not charged on each count or guilty of the same offenses. Jordan v. United States, 416 F.2d 338, 344 (9th Cir. 1969); Williamson v. United States, 310 F.2d 192, 197 (9th Cir. 1962); Wiley v. United States, 277 F.2d 820, 824 (4th Cir. 1960); Kleven v. United States, 240 F.2d 270, 272 (8th Cir. 1957). We find no reversible error here.
 
 
 9
 Defendants further state that when the government's counsel in his closing argument mentioned the theft and said, "Does this sound like people acting in self-defense?" this was prejudicial to the defendants other than Leach. The jury was immediately instructed to consider this evidence only against Leach and not against the others, and this was sufficient to cure any error. See White v. United States, 394 F.2d 49, 55 (9th Cir. 1968).
 
 
 10
 Farris and Leach testified on direct examination that they had been convicted of a felony. On cross-examination, they were asked how many times they had been convicted of a felony and Farris replied three and Leach four. They now complain that this was prejudicial and that the government should not have been permitted to inquire as to the number of convictions. There is no merit to this contention since it is axiomatic that when a defendant takes the stand in his own behalf he may be cross-examined with regard to prior felony convictions. Montgomery v. United States, 403 F.2d 605, 611 (8th Cir. 1968); Whitfield v. United States, 376 F.2d 5, 7 (8th Cir. 1967).
 
 
 11
 Defendants also contend that the court should not have permitted Agents Moriarty and McNamara to testify that they were in the tavern investigating alleged violations of the narcotics laws when the assaults occurred, and that they were entitled to a judgment of acquittal because the government failed to prove this independently of their testimony. This was a necessary element of proof since defendants were being tried for a violation of 18 U.S.C. § 111 which makes it unlawful to forcibly assault an agent "while engaged in or on account of the performance of his official duties." Their testimony was corroborated by the testimony of the agent in charge of the investigation, Clark, to the effect that they were on an official assignment under his direction, and other agents also testified regarding McNamara's and Moriarty's participation in the investigation.
 
 
 12
 Defendants assert that the search of the tavern conducted immediately following their arrests was illegal. Officers remained in the tavern after defendants were taken to the patrol cars and continued to search the premises for the guns used in the assault and the wallet taken from Moriarty. The money which was in the wallet had already been found on Leach. Defendants contend that the search was not necessary to prevent the defendants from using the seized weapons to inflict injury on the officers and that the officers had no right to search the storage area of the tavern. This was not a locked or closed-off area but merely a partitioned area with an open doorway into the tavern. It might well be considered a part of the same room. It is true that in Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the Supreme Court seems to have further limited the area within which a lawful search may be conducted incident to a lawful arrest, stating that the arrestee's person and the area within his immediate control may be searched but there is no justification for routinely searching any room other than that in which an arrest occurs or searching through desk drawers or other closed or concealed areas in that room itself. The Chimel case was decided June 23, 1969, which was subsequent to the search conducted here, and is not to be applied retroactively. See Williams v. United States, 418 F.2d 159, 162 (9th Cir. 1969); Lyon v. United States, 416 F.2d 91, 92-93 (5th Cir. 1969).
 
 
 13
 Leach attempted to introduce arrest records of the City of St. Louis which showed that he had been released on charges of armed robbery and assault to do great bodily harm. He argues that this would tend to show that he did not commit these offenses which were charged. He was not acquitted, however, as the same record shows that he was delivered to federal authorities in connection with charges of assault on a federal agent. It is common practice for the state to release a prisoner to face federal charges and, as the trial judge noted, it does not prove anything with regard to his innocence or guilt of the crimes charged. The introduction of such records could very well be misleading, and we do not think the trial court abused its discretion in refusing to allow them to be introduced. The court noted that if they were introduced, the government could bring in the circuit attorney to testify what action would be taken on the state charges in the event of an acquittal on the federal charges, that he did not think it would be of any benefit to the defense, and that it was not necessary to do an unnecessary thing.
 
 
 14
 It is urged that the court erred in permitting the introduction of a bullet with the markings on its base indicating that an attempt had been made to fire it. Officer Cortelyou, who removed it and five other shells from the gun which Roy Roberts snapped at McNamara, did not put any other marks of identification on the bullet itself but testified on direct examination that it was the same bullet. On cross-examination, however, he testified that just by looking at it he could not tell whether it was the same shell he saw that night or not. He did follow the standard police procedure, however, in sending it to the lab. He scratched his initials on the gun and personally forwarded it to the lab in a container furnished by the department, along with the bullet which had the markings indicating there had been an attempt to fire it, and five other cartridges taken from the gun which he put in a separate envelope. Although, technically, the procedure followed was not the best, we think that it was sufficient to assure proper identification and that the court did not err in admitting the bullet in evidence.
 
 
 15
 Defendants complain that the photographs of the two agents showing the extent of the assault should not have been introduced since defendants admitted assaulting them, but contended that they did so in self-defense, and that the photographs could serve no purpose other than to inflame the jury, citing Rivers v. United States, 270 F.2d 435, 437 (9th Cir. 1959). The photographs were held to be admissible in the Rivers case where the court said that the admission or rejection of photographs lies largely in the sound discretion of the trial court, and in the absence of a showing of abuse of discretion the trial court's ruling will not be disturbed on appeal. See also Maxwell v. United States, 368 F.2d 735 (9th Cir. 1966). In Harried v. United States, 128 U.S.App.D.C. 330, 389 F.2d 281, 287 (D.C.Cir. 1967), it was held that photographs of deceased's body which evidenced the mode of death by strangulation and stab wounds in the neck were admissible, stating that they had some probative value and were not intended solely to inflame the jury.
 
 
 16
 We think that the pictures of the agents which were introduced here had probative value in that a person acting in self-defense would be mainly concerned with warding off blows rather than inflicting injury, and from a picture showing the extent of the injuries the jury could draw a more accurate inference as to the reasons for the assault. The admission of the photographs was a matter within the sound discretion of the trial court, and we find no abuse of discretion here.
 
 
 17
 There is no merit to the contention that the court should have granted a mistrial because some of the jurors saw the defendants in handcuffs as they passed through the hall. Roy Roberts was out on bond and was not handcuffed. It is a normal and regular as well as a highly desirable and necessary practice to handcuff prisoners when they are being taken from one place to another, and the jury is aware of this. This is necessary to prevent an escape and possible injury to others in an escape attempt. It appears that from the construction of the building it was necessary for the jurors and the defendants to use the same corridor to get to the courtroom. No prejudice was shown and the court did not err in refusing to grant a mistrial. See Gregory v. United States, 365 F.2d 203, 205 (8th Cir. 1966); Hardin v. United States, 324 F. 2d 553, 554 (5th Cir. 1963).
 
 
 18
 Defendants contend that the fact that the trial judge addressed Agent Moriarty as "son" on one or two occasions was highly prejudicial and grounds for a mistrial. They quote from Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933), where it was stated that the court must preserve an attitude of impartiality throughout the trial. We think the court did so. A check of the record reveals that the trial judge not only called Moriarty "son" but also two of the defendants, Carl Roberts and Robert Farris, as well as some of the other witnesses. Thus, it was evident to the jury that this was a term which the judge applied to young men generally and that it did not indicate partiality.
 
 
 19
 Defendants argue that the fact that McNamara testified that Leach made a vulgar remark to him when he picked up his drink from the bar was cause for a mistrial because it was prejudicial. Stating that it was "vulgar" was no doubt less prejudicial than if the witness had repeated the remark itself. At any rate, McNamara's statement was stricken at the request of defense counsel and the jury was asked to disregard it, which cured any possible error. See United States v. Christian, 427 F.2d 1299 (8th Cir. 1970); McBride v. United States, 409 F.2d 1046, 1048 (10th Cir. 1969); United States v. Phillips, 375 F.2d 75, 81 (7th Cir. 1967); United States v. Hall, 342 F.2d 849, 854 (4th Cir. 1965).
 
 
 20
 On the day of the trial counsel for Carl Roberts requested a continuance, stating that he had been informed the Saturday before that Carl had obtained other counsel and did not wish him to represent him; however, the other attorney was not present at the trial. Carl's attorney of record also asked permission to withdraw in view of his client's dissatisfaction with him. The court denied both motions. It is contended on this appeal that the court abused its discretion in failing to grant defendant's motion for continuance "in order to permit him to retain new counsel." We do not agree. Counsel had represented defendant for almost three months with no indication that defendant was dissatisfied with his services until the Saturday before the trial was to commence the following Monday. The court was not advised until the morning of the trial. The case had previously been tried almost to conclusion and had ended in a mistrial. Defendant's counsel was thoroughly familiar with the case and the court observed that he was well known in the community as a lawyer with great proficiency in the field of defending people charged with crime. Also, he represented Carl's father, Roy Roberts, who had apparently found no fault with his representation. The granting of motions for continuance before or during trial is discretionary with the trial court, and in the absence of a clear abuse of discretion the action of the trial court will be sustained. Good v. United States, 378 F.2d 934, 935 (9th Cir. 1967); Johnson v. United States, 291 F.2d 150, 153 (8th Cir. 1961), cert. denied, 368 U.S. 880, 82 S.Ct. 130, 7 L. Ed.2d 80 (1961).
 
 
 21
 Defendants contend that the court erred in refusing to give the following instruction:
 
 
 22
 "In considering the plea of self-defense, the time, place and surrounding circumstances must be considered, together with the defendants' knowledge of prior acts and reputation of the person or persons believed to be threatening bodily harm to them."
 
 
 23
 This instruction was not pertinent to the situation here since the defendants themselves admitted that they knew nothing of the two agents who were assaulted. They contend, however, that because Agent McNamara said he was from Chicago they thought they were hoodlums from Chicago. As a reviewing court, we must view the instructions as a whole to see if the jury was properly charged. United States v. Bennett, 428 F.2d 772 (8th Cir. 1970); Kramer v. United States, 408 F.2d 837, 840 (8th Cir. 1969); Franano v. United States, 310 F.2d 533, 538 (8th Cir. 1962). We have reviewed all of the instructions and are convinced that the court adequately and fairly instructed the jury.
 
 
 24
 Defendants contend that the government's counsel committed reversible error in his final argument by asking the jury to "please, please do the right thing." When objection was made, the court commented that "all they are required to do is to do the right thing." The attorney then stated that as the government saw the case the jury's duty was to return a conviction. Defendants argue that the statement of counsel was improper because it was a personal request for the jury to do its duty and convict the defendants and that the error was compounded by the court's remark. Statements by counsel or the court are not cause for reversal unless prejudicial error is apparent. We find no reversible error here. Keeble v. United States, 347 F.2d 951, 956 (8th Cir. 1965); Koolish v. United States, 340 F.2d 513, 533 (8th Cir. 1965); Cochran v. United States, 310 F.2d 585, 589 (8th Cir. 1962). Cf. Orebo v. United States, 293 F.2d 747, 749 (9th Cir. 1961), cert. denied, 368 U.S. 958, 82 S. Ct. 402, 7 L.Ed.2d 389 (1962).
 
 
 25
 Defendants contend that they should have been permitted to introduce into evidence the entire criminal record of the informer Gentile in order to show the background of the man with whom the federal agents were associating at the time of the assault. Two of the defendants testified that they had known him while in prison and that he had the reputation of being a "creeper" or someone who was sneaky. He did not testify. We think the particular facts concerning his past criminal record were irrelevant and that the court properly excluded them.
 
 
 26
 Finding no error, the conviction judgments are affirmed.
 
 
 
 Notes:
 
 
 [1]
 18 U.S.C. § 111 provides:
 "Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.
 "Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."
 
 
 [2]
 See Benton v. Maryland, 395 U.S. 784, 788-793, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969)
 
 
 [3]
 In addition to pointing loaded guns at the agents, which is sufficient to constitute an assault, each defendant physically attacked at least one of them with either his fists, a chair, or by using the pistol as a bludgeon