Frederick MARTIN, Petitioner,

v.

Carl WHITE, Superintendent, Missouri Training School for Men, Respondent.

No. 82–0086–CV–W–1–R.

United States District Court, W. D. Missouri, W. D.

May 5, 1982.

---

14. *See* note 12, *supra.*

Frederick Martin, pro se.

John Ashcroft, Atty. Gen., of Mo., Lew A. Kollias, Asst. Atty. Gen., Jefferson City, Mo., for respondent.

## MEMORANDUM AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

JOHN W. OLIVER, District Judge.

### I.

This is still another State habeas case filed by the above petitioner. Earlier proceedings are reported in 411 F.Supp. 1069 (W.D.Mo.1975); 423 F.Supp. 884 (W.D.Mo. 1976); 433 F.Supp. 921 (W.D.1977), 568 F.2d 583 (8th Cir. 1977), *cert. denied* 435 U.S. 975, 98 S.Ct. 1623, 56 L.Ed.2d 69 (1978). On May 29, 1981, in case No. 78–0248–CV–W–1–R, in an unreported opinion, we denied petitioner's *Illinois v. Allen* [397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) ] claim. On November 25, 1981 the Court of Appeals for the Eighth Circuit in No. 81–1737, in an unreported order, affirmed that denial pursuant to the Eighth Circuit Rule 14.

### II.

Petitioner's most recent habeas petition presents the following two claims:

(a) It was error and abuse of discretion for the trial judge to refuse to grant a continuance in order for the petitioner to obtain another counsel where present counsel(s) were ineffective and unwanted;

(b) It was error not to suppress the In-court identification of witnesses Varsalona and Bell where it varied dramatically from the identification given immediately following the commission of the crime.

In the response filed by the Attorney General's office it is properly conceded that the petitioner exhausted all available state post-conviction remedies on direct appeal. The Attorney General's office, however, added that "under the facts of this case, respondent feels it is necessary to discuss the possible dismissal of this action under 28 U.S.C. § 2254, Rule 9, for abuse of the writ of habeas corpus." The respondent relies upon the views stated in Part III–C of *Rose v. Lundy*, —— U.S. —— at ——, 102 S.Ct. 1198 at 1203, 71 L.Ed.2d 379, decided 1982, but not yet reported, to support that contention.

The conclusion stated in Part III–C of *Rose v. Lundy*, the construction given Rule 9(b) and the reading given *Sanders v. United States*, 373 U.S. 1, 18, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963) therein, reflect the views of only four Justices of the Court: Justice O'Connor, joined by Chief Justice Burger, Justice Powell and Justice Rehnquist. Justice Brennan's opinion, joined by Justice Marshall, accurately states that the plurality conclusion stated in Part III–C of the opinion does not have the support of a majority of the Court. That opinion noted that both Justice White and Justice Blackmun expressly rejected the plurality conclusion stated in Part III–C of the opinion. While Justice Stevens' dissenting opinion did not reach the issue, the following two paragraphs from his dissenting opinion, in our judgment, clearly reflect his like rejection of Part III–C of the plurality opinion:

The "total exhaustion" rule the Court crafts today demeans the high office of the great writ. Perhaps a rule of this kind would be an appropriate response to a flood of litigation requesting review of minor disputes. An assumption that most of these petitions are groundless might be thought to justify technical pleading requirements that would provide a mechanism for reducing the sheer number of cases in which the merits must be considered. But the Court's experience has taught us not only that most of these petitions lack merit, but also that there are cases in which serious injustice must

be corrected by the issuance of the writ. In such cases, the statutory requirement that adequate state remedies be exhausted must, of course, be honored. When a person's liberty is at stake, however, there surely is no justification for the creation of needless procedural hurdles.

Procedural regularity is a matter of fundamental importance in the administration of justice. But procedural niceties that merely complicate and delay the resolution of disputes are another matter. In my opinion the federal habeas corpus statute should be construed to protect the former and, whenever possible, to avoid the latter.

It has long been the experience of this Court that creation and application of new rules of procedural niceties, designed to avoid the necessity of reaching the merits of a federal constitutional question, require the expenditure of much more judicial time than rules which are designed to require both State and lower federal courts to reach and decide the merits of such questions when properly presented under rules which, until recently, were understood and applied without difficulty by most of those courts. We therefore reject the argument that the dictum stated in Part III–C of the plurality opinion in *Rose v. Lundy* requires the dismissal of this case on the ground of abuse of the writ.

### III.

◼ The determination of the merits of petitioner's claims is not difficult. Petitioner's first claim relates to an alleged abuse of discretion by the State trial judge when he refused to grant a continuance. We have again reviewed the transcript and find that the factual circumstances stated in *State v. Martin*, 525 S.W.2d 804 (Mo.Ct.App. K.C.Dist.1975) are accurately stated. The following portion of the opinion of the Missouri appellate court shows that the rules of decision of the State of Missouri are consistent with federal standards:

In these circumstances, no abuse of discretion on the part of the trial court appears. The trial court obviously considered the move of the defendant as an effort to delay the trial rather than a bona fide action on the part of defendant to employ counsel of his own. The alleged newly employed counsel did not appear and no assurance was given as to when he might do so. The trial court was not obliged at that stage of the proceedings to grant a continuance on the basis of the defendant's statement. The request was directed to the court's discretion and the denial of the request was not error. See *State v. Jefferies*, 504 S.W.2d 6 (Mo.1974); *State v. Lahmann*, 460 S.W.2d 559 (Mo.1970); *United States v. Leach*, 429 F.2d 956, 963 [16, 17] (8th Cir. 1970), *cert. den.* 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 151 (1971).

Indeed, in concluding that the State trial judge did not abuse his discretion, the Missouri appellate court relied upon *United States v. Leach*, 429 F.2d 956, 963 (8th Cir. 1970), *cert. den.* 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 151 (1971). *Leach* is but one of many Eighth Circuit cases which state the same rule. *Leach* was most recently followed in *United States v. Lanier*, 578 F.2d 1246, 1253 (8th Cir. 1978).

### IV.

◼ In regard to petitioner's claim relating to the trial court's alleged failure to sustain the petitioner's motion to suppress the in-court identification testimony, the Missouri appellate court stated the following:

Appellant next contends that the trial court erred in failing to sustain his motion to suppress the in-court identification testimony of Varsalona and Bell. Appellant acknowledges that he can point to no out-of-court identification procedures which might have influenced the identification testimony. More significantly in this case defendant's identification was hardly an issue. He was apprehended at the scene of the crime. Bell and Varsalona saw him during the robbery and when he was arrested. There was no question that defendant was the person arrested, the sole question being

the extent of his participation in the robbery. The trial court did not err in overruling the motion.

The transcript on direct appeal shows that petitioner's motion to suppress pretrial identification was allegedly based on violations of principles stated in the trilogy of *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); and *Stoval v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and the progeny of those cases.

The transcript further shows that a pretrial hearing was conducted and that both witness Varsalona and witness Bell were examined. The appellant's brief in the Missouri appellate court properly stated that petitioner's claim does not present a typical *Wade* line-up question. That brief stated:

Appellant is not asserting that the prosecution used lineups or photographs or any other discernable mechanism in order to manipulate the witnesses' pretrial identification and thereby lay the groundwork for positive and firm in-court identification. Appellant does, however, wish to call to the Court's attention the testimony of the witness Harry Bell (Tr. 182, 183) wherein he affirms that something had happened to make him more able to identify appellant (Tr. 182) and wherein he states, "Well, you see, I really—I know that face really, now." (Tr. 183). [Appellant's brief, p. 18]

The two pages of the testimony of witness Bell, to which reference is made, reflects that defendant's counsel on cross-examination, fully developed the point that the witness's in-court identification could be said to have been more positive than the identification made at preliminary hearing.[1]

*Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), adopts the "totality of the circumstances" rule in cases involving eye witness identification. That case reviewed all of the Supreme Court cases relied upon by the petitioner in his motion. Application of the principles stated in those Supreme Court cases requires that we find and conclude that under the circumstances of this case we cannot say that there was any substantial likelihood of irreparable misidentification.

We therefore further find and conclude that petitioner's second claim is without merit.

For the reasons stated, it is

ORDERED that petitioner's petition for writ of habeas corpus should be and the same is hereby denied.

### APPENDIX A

FURTHER CROSS EXAMINATION BY MR. KATZ:

Q Mr. Bell, is it true that you, in a preliminary hearing when you were here in the courthouse previously about two or three months ago, that you said you were unable to identify the man that held you up, is this correct?

A I said, I wasn't sure, I think that is the man.

Q Did you say also at that time that you didn't look up after you gave the money to the robber who left the store?

A I said, I did not—after I gave it to him I did not look but I was looking at him when I went in.

Q But you didn't recognize him, is that correct?

A I recognized him when he first came in and when he was standing there.

Q But you didn't actually see him at that time, did you?

A I seen him.

Q You didn't see him do anything, did you?

A I didn't see him do anything?

Q Other than looking at the cookies?

A That is all.

Q You didn't see Mr. Martin do anything except looking at the cookies, is that correct?

---

1. The cross-examination of witness Harry Bell, pp. 181–184 of the transcript, to which reference was made in petitioner's brief on direct appeal, is attached hereto as Appendix A.

A He was looking at the cookies, that is correct.

Q All right. Now, you testified when you let Mr. Varsalona out of the cooler—

A That is right.

Q —did you observe—what was the first thing you observed after you let Mr. Varsalona out of the cooler?

A Well, I came right on back with him.

Q Were you in the back of Mr. Varsalona or were you in front of Mr. Varsalona?

A He came out and I shut the door and came right on up.

Q So, you were in back of Mr. Varsalona?

A That is right.

Q Did you observe—where were the police at this time?

A The police were inside.

Q Where, inside the store?

A They was inside the door, they were standing, they just came in the door.

Q Like, how many feet inside the store were they?

A I would say about five or six feet.

Q Five or six feet inside the door?

A That is right.

Q Is there anything that has happened to you within the last two or three months?

A Happened?

Q That makes you more able to identify this man, Mr. Martin, as being the man who was present in the store than there was two or three months ago when you testified under oath?

A Well, yes.

Q Did Mr. Martin shave a mustache, did he shave a beard off?

A Well, you see, I really—I know that face really, now.

Q Wasn't it true that the occurrence at the time when you testified before under oath, it was much closer to the time when the actual crime occurred, is that not true?

A Well, that may be, but—

MR. KATZ: O.K., no further questions, Mr. Bell.

REDIRECT EXAMINATION BY MR. DAKOPOLOS:

Q Mr. Bell, were you in some state of fear when you testified at the preliminary hearing?

A No.

Q Were you in some state of fear when this robbery occurred? ·

A Not too much, no, I was scared all right enough.

Q When you testified to the jury on direct examination that you saw this man with the gun in his hand, you are certain of that, is that correct?

A I am certain.

Q There is no doubt in your mind?

A No doubt.

MR. DAKOPOLOS: Thank you, Mr. Bell.

RECROSS EXAMINATION BY MR. KATZ:

Q When you testified two or three months ago under oath in front of a Court, didn't you at that time say that you were unable to identify Mr. Martin as being the man?

A I said, "I think."

Q All right.

A I think you will see that there, too.

MR. KATZ: No further questions.

MR. DAKOPOLOS: Thank you, Mr. Bell, you are excused.

(Witness excused.)

*ROBERT BIDWELL*, being duly sworn by the Deputy Circuit Clerk, testified:

DIRECT EXAMINATION BY MR. DAKOPOLOS:

Q Would you state your name to the court and jury, please?

A Robert Bidwell.

Q By whom are you employed?

A Kansas City, Missouri police department.

Q How long have you been so employed?

A Two years.

Q  Were you employed by the Kansas City, Missouri police department on August 17, 1973 at about 12:20 or 12:30 A.M.?

A  Yes, sir, I was.

Q  What duty were you assigned on that date at that time?

A  I was riding patrol.

Q  All right, sir. At about that time, did you receive any kind of dispatch?

A  Yes, sir, we did.

Q  What was that?

A  It was a hold up in progress at 3500 Indiana.

Q  What did you do when you received that?