DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of the Wood County Court of Common Pleas that found appellant guilty of one count of theft by deception and one count of telecommunications fraud and sentenced him to consecutive prison terms of 17 months for each offense. For the following reasons, the judgment of the trial court is affirmed. *Page 2 
 {¶ 2} Appellant sets forth the following assignments of error:
 {¶ 3} "I. The Trial Court erred to the prejudice of Appellant by denying his Motions for Acquittal, as the evidence presented was insufficient to sustain a conviction of the offenses for which he was charged and the verdict of the jury should be overturned for this same insufficiency.
 {¶ 4} "II. Appellant's conviction is against the manifest weight of the evidence in that the jury lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice.
 {¶ 5} "III. The Trial Court erred to Appellant's prejudice and denied him due process and a constitutional right to a fair trial by denying his motion for Mistrial following jurors' observations of Appellant in shackles.
 {¶ 6} "IV. The Trial Court erred in sentencing Appellant for the offenses of Telecommunication Fraud and Grand Theft by Deception where both charges were allied offenses of similar import and without a separate animus and thus not subject to a multiple sentence as proscribed by provisions of Ohio Revised Code § 2941.25."
 {¶ 7} The undisputed facts relevant to the issues raised on appeal are as follows. From March through September 2005, appellant sold on eBay 1,036 tickets to the Ohio State/University of Michigan football game to be played on November 19, 2005. Individuals who purchased the tickets through 399 separate transactions paid appellant a total of approximately $248,000. Appellant told his customers they would receive their tickets two weeks before the game. Appellant commingled the money he received from *Page 3 
these tickets sales and from other eBay sales transactions with funds he used to pay for his own vacation travel, tickets to special events for himself and his wife, and personal expenses such as two automobiles.
 {¶ 8} Eventually, 150 people received their tickets to the football game; another 250 people did not. The total amount paid to appellant for tickets that he never delivered was approximately $160,000. By early November 2005, many individuals who had not received the tickets for which they had paid began to worry. Two men who had not received their tickets went to appellant's house on November 14, 2005, demanding the tickets or their money back. By that time, the situation had begun to attract media attention. The following day, appellant fled the area, leaving his wife behind without telling her where he was going. On November 30, 2005, appellant was indicted on one count of fraud by telecommunications in violation of R.C. 2913.05(A) and one count of grand theft by deception in violation of R.C. 2913.02(A)(3). A warrant was issued for appellant's arrest. On January 30, 2006, appellant was found by police in Florida and returned to Ohio.
 {¶ 9} Appellant entered pleas of not guilty to the charges and trial to a jury commenced on September 26, 2006. Six individuals who purchased game tickets from appellant testified. Appellant stipulated at trial that he had sold more than 22 tickets to those individuals between April 30 and September 17, 2005, for a total of $6,563.
 {¶ 10} None of the witnesses received the tickets they purchased or a refund from appellant. Five of the ticket buyers testified that they had used Paypal to buy the tickets *Page 4 
from appellant on eBay; one testified he contacted appellant by e-mail and sent him a cashier's check for tickets that had not yet been posted on eBay. All were told they would receive their tickets by mail approximately two weeks before the game. Appellant did not indicate to any of the witnesses that he did not have the tickets in his possession. Several testified that they believed he had the tickets in hand because he was very specific about the location of the seats, referring to section and row numbers for the tickets they purchased. All of the witnesses testified they began to worry when they had not received their tickets a week or so before the game. At that point, each of the witnesses tried to contact appellant, by e-mail and by phone, to find out when they would receive their tickets. One reached appellant by telephone; appellant said he had the tickets and would call back the following day with the Federal Express tracking number. Another witness initially received an e-mail reply with a promise to send the tickets soon, but received no response to his later inquiries. The others received no responses to their e-mail inquiries.
 {¶ 11} Stone Burke, a senior fraud investigator for eBay, testified that he investigated appellant's account after eBay started to receive complaints from customers who had not received the football tickets they purchased from appellant. He further testified that between February 24 and September 23, 2005, appellant entered 400 transactions selling tickets for the football game for total sales of $250,330. His investigation further showed that appellant had entered only 22 transactions to buy tickets for the same game, paying a total of $11,093.49 for them. *Page 5 
 {¶ 12} Rex Russell, a special agent in the major crimes unit of the Ohio Bureau of Criminal Identification and Investigation, testified that he began to investigate appellant's ticket sales operation in response to a request for assistance from the Fostoria Police Department, which had been inundated with complaints about appellant. At the time Russell began to work on the case, over 100 complaints had been received by various agencies, including the Fostoria Police Department and the Ohio Attorney General's Office. After Russell learned that appellant's wife had filed a missing persons report with the Fostoria police, he requested help from the U.S. Secret Service in tracking appellant through the use of his credit cards. Russell closely examined appellant's financial records, looking for an influx of money or any large expenditures. Russell determined that a lot of appellant's income came from eBay Paypal direct deposits and that, contrary to what appellant had told his wife, appellant was not employed by a local facility as a counselor. After determining that appellant had used his ATM card several times in Orlando, Florida, and had made phone calls from that area, authorities located him in January 2006, and returned him to Ohio.
 {¶ 13} Appellant's wife, Teresa West, testified that it was her understanding appellant earned his income from employment as a drug abuse counselor and by selling special event tickets on eBay. Teresa learned of the complaints against her husband when she saw an article in the local paper on November 14, 2005. Later that day, appellant told her it was all a "big mistake" and that he would take care of it. The *Page 6 
following day, appellant stopped in to see Teresa at her work. She did not know where he went after that and did not see him again until the day of his trial.
 {¶ 14} Appellant testified on his own behalf, explaining that he began selling tickets to special events on eBay in late 2002 or early 2003. He testified that most of the time he did not have possession of the items he was offering for sale when he posted them on eBay. This is known as a "pre-sale" and eBay requires the seller in that situation to post information as to when the buyer should expect to receive the merchandise. Appellant admitted that in November 2005, he failed to deliver all of the tickets he had sold to the football game. He also admitted that with respect to the 2005 Michigan/Ohio State game it was common practice for him to offer specific rows and section numbers for the seats even though he did not have the tickets in hand. He stated that he never represented in his postings on eBay that he had the tickets in his possession unless he actually did have them.
 {¶ 15} Appellant testified that 399 individuals bought tickets from him for the 2005 Ohio State/Michigan football game. He estimated that 1,000 tickets were involved. Appellant ultimately failed to deliver between 600 and 700 tickets to approximately 250 of those customers. Appellant blamed his failure to acquire enough Ohio State/Michigan tickets on the unexpectedly high price of tickets he "pre-sold" for the September 10, 2005 Ohio State/Texas football game. He testified that because he miscalculated and had to pay substantially more than he had anticipated for the Ohio State/Texas tickets, he took a substantial loss and subsequently did not have enough money to purchase the Ohio *Page 7 
State/Michigan tickets which he had pre-sold. However, after the loss he experienced buying and selling tickets for the Ohio State/Texas game, appellant purchased two cars. Contrary to his earlier testimony that he stopped selling tickets after he realized that loss, appellant testified that he sold an additional $15,403 in tickets to the Ohio State/Michigan game after September 10, 2005.
 {¶ 16} Appellant testified that he had trouble acquiring tickets because individuals from whom he typically purchased them were holding onto theirs longer than they normally did and ticket brokers were charging more. Appellant further testified that he left Fostoria for Florida in order to purchase more tickets to satisfy some of his obligations.
 {¶ 17} Appellant stated that if he did not have tickets in his possession at the time of a sale, he did not tell the buyer so unless the buyer asked. He further stated that "The buyer is responsible for what he's buying." It was his "history" when selling tickets on eBay to indicate that they were for certain sections and rows, "hoping" that he would later be able to purchase those specific tickets. The item descriptions on his eBay site indicated that the tickets were "guaranteed" even though he sold the tickets before arranging with a broker to acquire them. Appellant admitted that in 2005, he deposited into his bank account approximately $225,000 which he had received from people who purchased the football tickets from him. He did not spend $225,000 on acquiring Michigan/Ohio State tickets but spent the money on other things, including trips, tickets *Page 8 
for other events and two cars. Appellant described this turn of events as "a bad business deal."
 {¶ 18} The jury found appellant guilty of both counts and the trial court sentenced appellant to consecutive prison terms of 17 months on each conviction. Appellant was ordered to pay restitution of $162,909.
 {¶ 19} In his first assignment of error, appellant asserts that the trial court erred by denying his Crim.R. 29 motions for judgment of acquittal. Appellant contends that the state failed to prove the essential elements of the crimes charged. He asserts that witness testimony revealed that his actions were legitimate and that he had no intent to defraud, his sole purpose being to sell tickets to his customers and build a profitable business for himself.
 {¶ 20} When reviewing the denial of a Crim.R. 29(A) motion, an appellate court evaluates whether the evidence is such that reasonable minds can differ as to whether each material element of the crime charged has been proven beyond a reasonable doubt. See State v.Bridgeman (1978), 55 Ohio St.2d 261, 263. The standard is the same as that used to review a sufficiency of the evidence claim. State v.Carter (1995), 72 Ohio St.3d 545, 553, 1995 Ohio 104. The test is whether, viewing the evidence in a light most favorable to the state, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Thompkins (1997),78 Ohio St.3d 380, 390, 1997-Ohio-52. *Page 9 
 {¶ 21} Appellant was convicted of one count of telecommunications fraud and one count of grand theft by deception. R.C. 2913.05(A), telecommunications fraud, states:
 {¶ 22} "(A) No person, having devised a scheme to defraud, shall knowingly disseminate, transmit, or cause to be disseminated or transmitted by means of a wire, radio, satellite, telecommunication, telecommunications device, or telecommunications service any writing, data, sign, signal, picture, sound, or image with purpose to execute or otherwise further the scheme to defraud."
 {¶ 23} R.C. 2901.22(B) states that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 24} The jury in this case found that the state presented evidence to show beyond a reasonable doubt that appellant knowingly transmitted via eBay offers to sell tickets for the November 19, 2005 football game. Appellant did not dispute that he posted the tickets for sale on eBay. It is also not disputed that his computer was a "telecommunications device." Further, appellant's postings on eBay satisfy the definition of "data" set forth in R.C. 2913.01(R).
 {¶ 25} Appellant disputes that he devised a "scheme to defraud" and purposely acted to further the scheme. Pursuant to R.C. 2913.01(B), to "defraud" means to "knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." R.C. 2913.01(A) defines "deception" as *Page 10 
"knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." And finally, as defined in R.C. 2901.22(A), a person acts purposely "when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
 {¶ 26} The jury found that appellant intended to deceive the ticket buyers and thereby benefit himself. Appellant did not tell his buyers that he did not have possession of the tickets he was offering, yet he described the seats in sufficient detail that the buyers believed he had the tickets in hand. The evidence showed that appellant: (1) accepted payment of tens of thousands of dollars for tickets several months before the tickets became available on the market, (2) used the money paid to him for various personal expenses rather than to purchase the tickets he "pre-sold," and (3) even after he knew he did not have sufficient funds to satisfy his obligations, told individuals who contacted him that he would mail their tickets right away.
 {¶ 27} Finally, the state was required to show that the value of the benefit obtained by appellant or of the detriment to the victims of the fraud was more than $5,000 or less than $100,000. R.C. 2913.05(B). Testimony of five individuals who purchased tickets *Page 11 
from appellant through eBay showed that they paid appellant in excess of $5,000. Appellant stipulated to those figures.
 {¶ 28} Based on the foregoing, viewing the evidence in a light most favorable to the prosecution, we conclude that a reasonable jury could have found beyond a reasonable doubt that appellant did knowingly transmit data with purpose to further a scheme to defraud.
 {¶ 29} Next, we consider the evidence produced by the state in support of the charge of grand theft by deception. R.C. 2913.02(A)(3) states that no person, "with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * by deception." Pursuant to R.C.2913.01(C)(3), "deprive" means to accept, use or appropriate money with purpose not to give proper consideration in return for the money and without reasonable justification or excuse for failing to give proper consideration. If the value of the property stolen is greater than $5,000 and less than $100,000, a violation of R.C. 2913.02 is grand theft, a felony of the fourth degree. As explained above, five witnesses testified that they paid a total of over $5,000 for tickets they did not receive.
 {¶ 30} The jury found that appellant intended to accept his customers' money without giving proper consideration in return. Appellant testified that he used the buyers' money without first acquiring the tickets he had "pre-sold." The jury further found, after hearing appellant's extensive testimony, that appellant did not have reasonable justification for failing to provide the buyers with their tickets. Appellant testified that he *Page 12 
did not keep the buyers' money in a separate account but deposited it in his personal bank account and used it for such things as buying new cars, taking trips and customizing his pick-up truck.
 {¶ 31} Accordingly, we find that, when viewing the evidence in a light most favorable to the prosecution, a reasonable jury could have found beyond a reasonable doubt that appellant, with purpose to deprive his customers of their property, knowingly obtained their property by deception.
 {¶ 32} Based on the foregoing, we find that there was sufficient evidence to sustain the convictions of telecommunications fraud and grand theft by deception, and that the trial court did not err by denying the Crim.R. 29 motions for acquittal. Appellant's first assignment of error is not well-taken.
 {¶ 33} In his second assignment of error, appellant argues that his convictions were not supported by the manifest weight of the evidence. In support, appellant correctly notes that this claim requires consideration of the same evidence as that reviewed under his first assignment of error.
 {¶ 34} In determining whether a verdict is against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and "* * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins, supra, at 387. *Page 13 
 {¶ 35} In considering appellant's first assignment of error, we thoroughly reviewed the evidence presented at trial as well as the elements of the two offenses of which appellant was convicted. Determinations of credibility and the weight given to testimony remain within the province of the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. We cannot say that the trier of fact in this case lost its way. Accordingly, appellant's second assignment of error is not well-taken.
 {¶ 36} In his third assignment of error, appellant asserts that the trial court erred by denying his motion for a mistrial made after some of the jurors saw him being escorted to the elevator in shackles during a recess on the second day of trial.
 {¶ 37} The record reflects that during lunch recess, a deputy sheriff made the following statement to the court: "Judge, I got a problem. I was working on the impression that members of the jury had all gone, so I went to the elevator with my prisoner. Three or four members of the jury just came around the corner, and I was standing right there with the guy in shackles." The judge met with counsel in chambers before trial resumed and at that time the defense moved for a mistrial. After a discussion of case law on the subject, the trial court denied the motion. The court offered to provide a curative instruction, but defense counsel expressed concern that an instruction to all 13 jurors would compound the problem since only three or four had been involved. The record reflects that at the close of evidence, the court instructed the jurors that "anything you've seen or heard outside the courtroom or in the news media report is not evidence and should be disregarded by you entirely in your decision in this case." *Page 14 
 {¶ 38} Generally, the granting or denying of a mistrial rests within the sound discretion of the trial court. State v. Graham (Feb. 4, 1994), 6th Dist. No. S-93-13, citing State v. Sage (1987), 31 Ohio St.3d 173. An appellate court will not disturb this exercise of discretion "absent a showing that the accused has suffered material prejudice." Id. The granting of a mistrial is only necessary where a fair trial is no longer possible. Id., citing State v. Franklin (1991), 62 Ohio St.3d 118, 127.
 {¶ 39} In State v. Kidder (1987), 32 Ohio St.3d 279, a juror observed the criminal defendant wearing shackles in the hallway outside the courtroom. Defense counsel requested a voir dire of the juror but the trial court refused, instead giving a general instruction to all of the jurors similar to that given in the case before us. In Kidder, the Ohio Supreme Court found that any error in refusing to voir dire the juror was harmless, given the brevity of the juror's observation and the trial court's corrective instruction. Id. at 285. In federal appeals cases involving jurors' fleeting view of defendants in handcuffs and shackles, courts have recognized that a juror's brief, inadvertent view of a defendant in shackles will not violate due process in the absence of a showing of actual prejudice. See United States v. Halliburton (C.A.9, 1989), 870 F.2d 557, 560-61; Ghent v. Woodford (C.A.9, 2002),279 F.3d 1121, 1133 fn. 11. Federal courts also have recognized that it is a normal and necessary practice for prisoners to be handcuffed while they are being transported from one place to another and jurors are aware of that. See United States v. Leach (C.A.8, 1970), 429 F.2d 956, 962. *Page 15 
 {¶ 40} In accordance with the cases cited above, we find that the jurors' brief view on one occasion of appellant in restraints when he was being transported did not violate his due process rights. Appellant has not shown how he was prejudiced by the incident and, accordingly, his third assignment of error is not well-taken.
 {¶ 41} In his fourth assignment of error, appellant asserts that the trial court was prohibited by R.C. 2941.25 from sentencing him on both convictions because the charges were allied offenses of similar import. This argument is without merit.
 {¶ 42} R.C. 2941.25 provides:
 {¶ 43} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 {¶ 44} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
 {¶ 45} As the Supreme Court of Ohio explained in State v. Rance,85 Ohio St.3d 632, 1999-Ohio-291:
 {¶ 46} "If the elements of the crimes `correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import.' If the elements do not so correspond, the offenses are of *Page 16 
dissimilar import and the court's inquiry ends — the multiple convictions are permitted." (Citations omitted.)
 {¶ 47} Ranee further explained that "[u]nder an R.C. 2941.25(A) analysis, the statutorily defined elements of the offenses that are claimed to be of similar import are considered in the abstract."Ranee, supra, at paragraph one of the syllabus.
 {¶ 48} In comparing the elements of R.C. 2913.02(A)(3), grand theft by deception, with those of R.C. 2913.05(A), telecommunications fraud, we conclude that the commission of one of these offenses does not necessarily include the commission of the other offense. The elements of the two offenses were clearly set forth under our analysis of appellant's first assignment of error and we will not belabor this issue by repeating the language. Upon our careful review of the elements of the offenses, we find that the elements do not correspond. The only similarity between the two offenses is that each is required to be committed knowingly. Consequently, they are not allied offenses of similar import and the trial court was not required to merge them for purposes of sentencing. Accordingly, appellant's fourth assignment of error is not well-taken.
 {¶ 49} On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Wood County Court of Common Pleas is affirmed. Appellant is ordered to pay the cost of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Wood County.
 JUDGMENT AFFIRMED. *Page 17 
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
 Handwork, J., Singer, J. and Osowik, J., concur. *Page 1